UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
DOUGLAS FAULKNER, et al.,

                     Plaintiffs,

          -against-                            97 Civ. 9361 (LAK)

NATIONAL GEOGRAPHIC SOCIETY, et al.,

                     Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
FRED WARD, et ano.,

                     Plaintiffs,

          -against-                        99 Civ. 12385 (LAK)

THE NATIONAL GEOGRAPHIC SOCIETY, et al.,

                     Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
DAVID HISER, et al.,

                     Plaintiffs,

          -against-                        99 Civ. 12488 (LAK)

NATIONAL GEOGRAPHIC SOCIETY, et al.,

                     Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## OPINION

Appearances:

Danial Alan Nelson
SCHADEN, KATZMAN, LAMPERT &
MCCLUNE

*Attorneys for Plaintiffs Louis Psihoyos, Rick
Rickman, David Austen and Matrix Int'l, Inc.*


Stephen A. Weingrad
William D. Gardner
WEINGRAD & WEINGRAD, LLP

*Attorneys for Plaintiffs David Allen, A.
Allen, Douglas Faulkner, Sally Faulkner,
Doranne Jacobsen, Jerome Jacobsen,
Pamela Wilson Sartorelli, Jon Krakauer,
Richard Coniff, Elizabeth Royte, John
Knoebber, and Joe Baraban*

Andrew Berger
TANNENBAUM, HELPERN, SYRACUSE &
HIRSCHTRITT, LLP

*Attorneys for Plaintiff Fred Ward*


Robert G. Sugarman
Denise Alvarez
WEIL, GOTSHAL & MANGES LLP
Terrence B. Adamson
NATIONAL GEOGRAPHIC SOCIETY
*Attorneys for Defendant National
Geographic Society*

LEWIS A. KAPLAN, *District Judge*

The plaintiffs in these three actions are freelance photographers and writers whose work has been published in *National Geographic Magazine* (the "*Magazine*"). The essence of their claim is that they granted National Geographic Society ("NGS") limited rights to publish their works in the *Magazine* and that NGS and the other the defendants infringed their intellectual property and contract rights by republishing their work beyond the rights granted to them. This Court has dismissed plaintiffs' federal claims, including those based upon the Copyright Act of 1976 (the "1976 Act"), and the majority of their state law claims. The matter is now before the Court on the motion of defendant NGS for partial summary judgment dismissing plaintiffs' claims for breach of express and implied contracts to make additional payments for certain further uses of plaintiffs' work.[1]

*Facts*

The facts surrounding these cases have been set out in detail in several prior opinions, familiarity with which is assumed.[2] It is necessary to outline only those facts relevant to the present motions.

---

[1]    The plaintiffs represented by the Weingrad law firm assert that their claims for unjust enrichment present questions of fact and should not be dismissed on summary judgment. Weingrad Pls. Mem. 5, 10. The Court will not address this argument as it already has dismissed plaintiffs' unjust enrichment claims as preempted by federal law. *See Faulkner v. Nat'l Geographic Soc'y,* 211 F.Supp.2d 450, 477, *mod. on reconsideration,* 220 F.Supp.2d 237 (S.D.N.Y. 2002) ("*Faulkner I*")

[2]    *See, e.g., Faulkner I,* 211 F.Supp.2d at 455-61; *Ward v. Nat'l Geographic Soc'y,* 208 F.Supp.2d 429 (S.D.N.Y. 2002); *Faulkner v. Nat'l Geographic Soc'y,* 294 F.Supp.2d 523, 531 (S.D.N.Y. 2003) ("*Faulkner II*").

*Background*

NGS is the world's largest nonprofit scientific and educational organization, with approximately ten million members.  Plaintiffs created images or text that originally appeared in the print version of the *Magazine,* NGS's official monthly journal.  Although the parties dispute whether and to what extent NGS was entitled to make subsequent use plaintiffs' works, all agree that plaintiffs granted NGS the right to publish their works in the *Magazine*.[3]

In the late 1990's, NGS and the other defendants in these actions began to market various editions of "The Complete National Geographic" (the "CNG"), a digital archive of all past issues of the *Magazine* on CD-ROM and DVD.   The CNG was produced largely through a process of digital scanning, with each past issue scanned into electronic media.  The pages of the prior issues were scanned two at a time, so that a user of the CNG is presented with the exact same visual experience as if reading from the print version of the *Magazine.*   As the Court noted in a prior opinion, Defendants claim that the scanning process created an "exact image-based reproduction" of each page as it appeared in the *Magazine*.[4]

The first edition of the CNG, "The Complete National Geographic:  108 Years of National Geographic Magazine on CD-ROM," was introduced in 1997.  It has three components: (1) a multimedia sequence that displays NGS's logo followed by a promotional message for Eastman Kodak Company and a sequence depicting the covers of ten issues of the *Magazine* that transition

---

[3] *Faulkner II,* 294 F.Supp.2d at 525-26.

[4] *Id.* at 527.

3

from one into another (the "Moving Cover Sequence"); (2) a digital reproduction of the scanned

pages and issues of the *Magazine* (the "Replica"); and (3) the computer software that serves as the

storage repository and retrieval system for the *Magazine* images.  Since 1997, the NGS has published

additional CNG products, principally CD-ROMs and DVDs for the first 109, 110, 111 and 112 years

of the *Magazine*.   These products have varied slightly from the first, but all contain a Replica

section.[5]

Following the release of the CNG products, plaintiffs filed suit, asserting that the

production and sale of the CNG infringed their copyrights, breached their express and implied

contracts with NGS, and otherwise violated their rights with respect to contributions to the

*Magazine.*

*Procedural History*

After dismissing some of plaintiffs' claims on previous summary judgment motions,

the Court in *Faulkner II* was called upon to determine whether NGS, as owner of the copyrights in

the individual issues of the *Magazine,* was privileged by Section 201(c) of the 1976 Act to market

the CNG on the theory that the CNG was a revision of the *Magazine* rather than a new collective

work infringing plaintiffs' copyrights in original contributions.[6]  Relying on the Supreme Court's

---

[5]

    *Id.* at 528-29.

[6]

    As the Court explained*,* Section 201(c) provides that "the copyright in each separate
contribution to a collective work . . . vests initially in the author of the author of the
contribution."  Absent an express transfer, the owner of the copyright in the collective work
acquires only the "privilege of reproducing and distributing the contribution as part of that
particular collective work, any revision of that collective work, and any later collective work
in the same series."  17 U.S.C. § 201(c).

4

then recent decision in *New York Times v. Tasini,*[7] the Court reasoned that

> "[i]n determining whether [a] freelancer's work is part of a new collection as distinguished from a revision [of the original collective work], the focus is on the manner in which it is 'presented to, and perceptible by, the user.' A critical consideration is whether the original contribution is presented in the same context in which it appeared in the initial collective work, at least to such an extent that the new product 'perceptibly presents the author's contribution as part of a revision of the collective work."[8]

Because the CNG is a near exact replica of the *Magazine,* presented to and perceptible by the user in the same manner as the original *Magazine* with "no changes to the content, format or appearance," the Court held that it was a revision, rather than a new work, and granted defendants' motion for summary judgment dismissing plaintiffs' claims for copyright infringement under the 1976 Act.

Upon dismissal of the copyright claims, the last federal claims in the actions, the Court dismissed plaintiffs' remaining state law claims for breach of express and implied contract based on the lack of subject matter jurisdiction.[9] Plaintiffs then appealed the dismissal of their copyright claims, and the Second Circuit affirmed this Court's decision in substantial part.[10] The parties, save those represented by the Weingrad firm, then stipulated to the Court's retention of jurisdiction over the remaining state law claims, and the Court overruled the Weingrad firm's

---

[7] 533 U.S. 483 (2001).

[8] *Faulkner II,* 294 F.Supp.2d at 540 (quoting *Tasini,* 533 U.S. at 499, 504).

[9] In one of the actions, No. 99 Civ. 12385, the Court dismissed without prejudice to the prompt filing of an amended complaint alleging complete diversity of citizenship and the requisite matter in controversy.

[10] *Faulkner v. Nat'l Geographic Soc'y,* 409 F.3d 26 (2d Cir. 2005). The Second Circuit reversed the dismissal of the copyright infringement claims as to six additional photographs taken by plaintiffs in 02 Civ. 6623.

5

objection to its retention of jurisdiction based upon its familiarity with the case and the desire of substantially all the parties to have the remaining issues decided in this Court.[11]

*The Contract Claims*

Plaintiffs claim that NGS was contractually obligated to make additional payment to them for any further promotional, advertising, or editorial use of their work.  They assert that the CNG constituted such a further use and that NGS breached their express and implied contracts by failing to make additional payments for use of their work therein.

Plaintiffs' express contract claims rest on dozens of different contracts.[12]  Because NGS often entered into separate agreements with its contributors for each new work assignment and because the precise terms of the contracts varied somewhat over time and from contributor to contributor, these claims are based on several different formulations of the idea that NGS would provide additional payment for certain subsequent use of plaintiffs' work.  Many of the contracts at issue provide that contributors

> "hereby grant the Society the right to use any of the commissioned photographs for promotional or advertising purposes.  We will make additional payment for such use or for a new editorial use.  No additional payment will be made for photographs taken on a Geographic commission then later used in an NGS photographic

---

[11]

*Faulkner v. Nat'l Geographic Soc'y,* Nos. 97 Civ. 9361 (LAK), 99 Civ. 12488 (LAK) (S.D.N.Y. Mar. 8, 2006) (97 Civ. 9361, docket item 141) (retaining jurisdiction over state law claims).

[12]

Many of the contracts are appended to the Appendix of Exhibits and Deposition Testimony ("Def. App."), which defendants submitted in connection with their prior motion for partial summary judgment, and to NGS's Supplemental Appendix of Exhibits and Deposition Testimony ("Def. Supp. App.").

exhibit."[13]

Others state that NGS will make "additional appropriate payment" to contributors if "NGS makes further use (promotional, adverstising, or other editorial use) of a photograph selected for publication," but note that "no additional payment will be made if the use is as part of an NGS photographic exhibit or in an audio-visual presentation or lecture given by an NGS employee or under NGS auspices."[14]   The remaining agreements were to similar effect.[15]

Several plaintiffs conveyed rights in some or all of their works to NGS without an express written contract or pursuant to an agreement that did not obligate NGS to make additional

---

[13]

Def. Supp. App. Exs. 1, 2, 3, 4, 5, 6, 7, 12-14 (original contract and two extensions), 15, 16, 17, 24, 25, 26, 27, 28, 29, 30; Def. App. Exs. F-3, F-4,   Several of these contracts further state that "[n]o additional payment will be made for photographs taken on a Geographic commission and subsequently released through the NGS news service."  Def. Supp. App. Exs. 1, 2, 3, 12-14, 24.  Others provide also that contributors will not receive additional payment for use of the work "in a public service audiovisual presentation given by a member of the Society's staff."  Def. Supp. App.  Ex. 17.

[14]

Def. Supp. App. Exs. 9, 10, 11, 18, 19, 20, 22, 23.   Several other contracts include nearly identical language.  Def. Supp. App. Exs. 8, 21, 31; Def. App. Exs. F-6, F-7.

[15]

For example, several other contracts provide:

"In return for NGS's conveying copyright in assignment photographs to you, you hereby grant to NGS and NGS retains a perpetual worldwide nonexclusive license to reproduce any photographs from the assignment, whether published or unpublished, for NGS use or for NGS products.  NGS shall make payment to you for any such use under the license . . . except [that] . . . NGS shall make no payments to you if the use is for educational purposes."  Hiser Aff. P19-20.

Instead of signed written contracts, several of the plaintiffs rely on letters they received from NGS discussing the relevant assignment and NGS's expectations and obligations.  Some of these letters refer to additional payment to be made for further use of plaintiffs' work.  *See, e.g.,* Sugarman Rep. Aff. Ex. 7 (letter to Plaintiff Douglas Faulker from NGS explaining that "the purchased photographs become the property of [NGS] for use in its publications and for any other purpose" and that "such further use will be paid for at standard [NGS rates]" with certain exceptions).

payment for further use of their contributions.[16]  Accordingly, plaintiffs bring claims for breach of

alleged contracts implied in fact, as well as for breach of express contracts.[17]

*Discussion*

I.      *Summary Judgment Standard*

Summary judgment is appropriate if there is no genuine issue of material fact and the

moving party is entitled to judgment as a matter of law.[18]  The moving party has the burden of

demonstrating the absence of a genuine issue of material fact,[19] and the Court must view the facts

---

[16]

> For example, NGS published photographs taken by plaintiff Fred Ward in twelve articles. Mr. Ward and NGS did not enter into written contracts with respect to photographs published in five of those articles.  *Ward* Supp. Mem. 3; *see also Ward,* 208 F.Supp.2d at 434 n.17.  The contracts governing photographs used in six of the remaining articles do not expressly provide for additional payment for further use.  Berger Decl. Ex. 6; *Ward* Supp. Mem. 3.  Other plaintiffs also worked without written contracts and/or entered into agreements with NGS that did not explicitly require NGS to make additional payment for further use of their work.  *See, e.g.,* Hiser Aff. P7-P9, P12, 13; Def. App. K-1; Weingrad Pls. Mem. 5-10.

[17]

> The third amended complaint in 99 Civ. 12385, brought on behalf of Fred Ward, includes separate counts for breach of express contract and for breach of implied contract. The operative complaints in 97 Civ. 9361 and 99 Civ. 12488 do not state separate claims for breach of implied contract, but each states that "NGS actually and impliedly agreed to pay certain fees for the one time magazine publication of the images and text . . . and, in some contracts agreed to pay additional fees for any additional uses."  The Court will interpret this language as a claim for breach of implied contract.

[18]

> Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *White v. ABCO Eng'g Corp.*, 221 F.3d 293, 300 (2d Cir. 2000).

[19]

> *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).

8

in the light most favorable to the nonmoving party.[20]  Where the burden of proof at trial would fall

on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go

to the trier of fact on an essential element of the nonmovant's claim.[21]  In that event, the nonmoving

party must come forward with admissible evidence[22] sufficient to raise a genuine issue of fact for

trial.[23]

In a dispute over the interpretation of a contract, summary judgment will be

warranted in two situations.  First, summary judgment may be granted when the language of the

contract is unambiguous.[24]  Under New York law,[25] "[c]ontract language is unambiguous if it has

---

[20]

United States v. Diebold, Inc., 369 U.S. 654, 655 (1962); Hetchkop v. Woodlawn at Grassmere, Inc., 116 F.3d 28, 33 (2d Cir. 1997).

[21]

Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Virgin Atl. Airways Ltd. v. British Airways PLC, 257 F.3d 256, 273 (2d Cir. 2001).

[22]

See, e.g., Nora Beverages, Inc. v. Perrier Group of Am., Inc., 269 F.3d 114, 123-24 (2d Cir. 2001).

[23]

See, e.g., Nebraska v. Wyoming, 507 U.S. 584, 590 (1993); Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir. 1995).

[24]

Omni Quartz, Ltd. v. CVS Corp., 287 F.3d 61, 64 (2d Cir. 2002) (citing Seiden Assocs. v. ANC Holdings, Inc., 959 F.2d 425, 428 (2d Cir.1992); Nycal Corp. v. Inoco PLC, 998 F.Supp. 296, 299 (S.D.N.Y. 1997), aff'd, 166 F.3d 1201 (2d Cir.1998) (citing Mellon Bank, N.A. v. United Bank Corp., 31 F.3d 113, 115 (2d Cir. 1994).

[25]

The parties appear to assume that New York law applies here.  See, e.g., Def. Supp. Mem. at 8; Weingrad Pls. Mem. 14 n.6; Weingrad Pls. Supp. Mem. 4.  Although the District of Columbia also has a strong interest in the contracts at issue – several of which include a D.C. choice-of-law provision – the parties have pointed to no conflict between the relevant laws of New York and the District of Columbia, and the Court is aware of none.  To the contrary, the law of the two jurisdictions is in accord on the relevant issues.  Compare Air Transport Ass'n of America v. Lenkin, 711 F.Supp. 25, 28-29 (D.D.C. 1989) (applying D.C. law), and Hart v. Vermont Inv. Ltd. P'ship 667 A.2d 578, 582 -583 (D.C. 1995), with Nycal, 988 F.Supp. at 298-303.  Accordingly, no choice-of-law analysis is necessary and the Court

a definite and precise meaning, unattended by the danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion."[26] In such cases, courts may not consider extrinsic evidence of the parties' intent, instead determining the meaning of the contract "from the terms expressed in the instrument itself."[27]

Summary judgment is appropriate also "when the language [of the contract] is ambiguous and there is relevant extrinsic evidence, but the extrinsic evidence creates no genuine issue of material fact and permits interpretation of the agreement as a matter of law."[28]   In other words, "[i]f all the extrinsic evidence supports a single interpretation, the court may grant summary judgment for the party advocating the interpretation, almost as if the language had been unambiguous in the first place."[29]

---

will apply New York law.  *Employers Ins. of Wausau v. Duplan Corp.,* 899 F.Supp. 1112, 1118 (S.D.N.Y.1995) (absent showing of conflict, law of forum state applies); *see also In re Rezulin Prods. Liab. Litig.,* 390 F.Supp.2d 319, 330 (S.D.N.Y.,2005) ("No choice of law ruling is called for where there is no conflict of laws.") (citing *In re Allstate Ins. Co.,* 81 N.Y.2d 219, 223, 597 N.Y.S.2d 904, 905, 613 N.E.2d 936 (1993)).

[26]   *Metro. Life Ins. v. RJR Nabiso, Inc.,* 906 F.2d 884, 889 (2d Cir. 1990) (quoting *Breed v. Ins. Co. of N. Am.,* 46 N.Y.2d 351, 355, 413 N.Y.S.2d 352, 355 (N.Y. 1978); *see also Seiden Assocs. v. ANC Holdings, Inc.,* 959 F.2d 425, 428 (2d Cir.1992).

[27]   *Metro. Life,* 906 F.2d at 889; *see also Omni Quartz,* 287 F.3d at 64 ("It is well established that a court may not admit extrinsic evidence in order to determine the meaning of an unambiguous contract.").

[28]   *Nycal,* 988 F.Supp. at 299;  *Shepley v. New Coleman Holdings Inc.,* 174 F.3d 65, 72 (2d Cir. 1999).

[29]   *Nycal,* 988 F.Supp. at 299, n.11 (quoting *Borkan v. Quest Med. Inc.,* No. 95 Civ. 10381 (MBM), 1996 WL 445361, at *3 (S.D.N.Y. Aug. 7, 1996).

The first question therefore is whether the express contract language at issue here is ambiguous.

II.      *The Express Contracts Are Ambiguous*

NGS contends that the language requiring payment for further use is unambiguous, arguing that *Faulkner II* "compels the conclusion that the use of the Plaintiffs' contributions in the CNG is not a 'further' or 'new' editorial use."[30]  Specifically, it asserts that "[s]ince neither the editorial content of the Magazine nor the editorial content in which Plaintiffs' contributions appeared in the Magazine were altered in the CNG, and since it is not a 'new collection,' 'a new anthology or an entirely different magazine or other collective work," it cannot be a 'new' or 'further' editorial use."[31]

This argument has some appeal.  The fact that the CNG is a revision rather than an entirely new collective work under Section 201(c) certainly suggests that it should not be considered a further use of plaintiffs' works under the relevant contracts.  The manner in which plaintiffs' original contributions are "presented to, and perceptible by, the user" is an important factor in determining whether NGS has put those works to further use and therefore is required to make additional payments to the plaintiffs.

*Faulkner II* is not dispositive, however.  The Court there construed the meaning of the term "revision of [a] collective work" under Section 201(c) rather than the meaning of the

---

[30]     Def. Supp. Mem. 5.

[31]     *Id.* at 6.

11

"further use" language in the plaintiffs' contracts.  *Faulkner II* thus not only interpreted different terms than those at issue here, it necessarily employed different analytical tools than those necessary to deciding this motion.  Where the language of a statute is unclear, "resort to legislative history is appropriate,"[32] so the Court in *Faulkner II* looked to Congressional reports to interpret the meaning of Section 201(c).[33]  By contrast, legislative history generally is irrelevant to contract interpretation where court's "primary objective is to give effect to the intent of the parties as revealed by the language they chose to use."[34]  Although relevant to the inquiry, then, *Faulkner II* does not, as NGS asserts, control the interpretation of the contract terms at issue here.  Accordingly, the Court must look to the language itself to determine whether any ambiguity exists.

As discussed above, "'[c]ontract language is ambiguous if it is reasonably susceptible of more than one meaning.'"[35]  Here, the contracts provide for additional payments from NGS upon further editorial or advertising use of plaintiffs' works.  A reasonable person could interpret this language to encompass nearly any new use of the those contributions apart from the enumerated exclusions.  On the other hand, it would not be unreasonable to read the contracts as requiring additional payment only when contributors' works have been published in a materially different editorial context than the *Magazine* or when "they have been used to advertise or promote a product

---

[32]

      *Faulkner II,* 294 F.Supp.2d at 538-39.

[33]

      *Id.*

[34]

      *Seiden,* 959 F.2d at 428.

[35]

      *Nycal,* 98 F.Supp. at 299 (quoting *Burger King Corp. v. Horn & Hardart Co.,* 893 F.2d 525, 527 (2d Cir. 1990)).

or service."[36]  The language by itself simply does not compel one interpretation or the other.  The Court therefore finds that the "further use" provisions are facially ambiguous.

III.    *Extrinsic Evidence*

Even where a contract is ambiguous, "a court appropriately may dispose of a contract interpretation dispute on summary judgment . . . if [it] finds either that there is no relevant extrinsic evidence or that there is relevant extrinsic evidence, but such evidence is so one-sided that it does not create a genuine issue of material fact."[37]  Here the parties identify three different types of extrinsic evidence: plaintiffs' own alleged subjective intentions in entering into the contracts with NGS, characterizations of the CNG by NGS and its employees, and the prior course of dealing under the contracts.  The Court will address each in turn to determine if it creates a genuine issue of material fact as to the interpretation of the "further use" provisions.

A.    *Evidence of Plaintiffs' Intentions*

First, plaintiffs point to their own testimony and affidavits indicating that, at the time they entered into the contracts, they believed and intended that they would receive additional payments if their works were used in formats like the CNG.  Plaintiff David Allen, for example, asserts that in contracting with NGS for publication of his work,

"[my] intention was to license the images and text for a one-time, paper rights only use for publication in an educational magazine. Any additional usage, while authorization was

---

[36]    Def. Supp. Mem. 3.

[37]    *Nycal,* 988 F.Supp. at 300.

13

> freely given, was expected to be compensated, because [I] own the copyrights. [I] did not intend, nor did [I] contemplate that [my] work would be used without payment for profit and commercial purposes in CD-ROM or in DVD formats, which did not exist at the time of the contracts."[38]

Likewise, plaintiff Fred Ward testified in his deposition that "[m]agazines would hire a . . . [photographer] to do a project, in return for a fee, space rate or day rate, they would get one-time rights, and nothing more.  And additional use meant additional pay."[39]  The affidavits of other plaintiffs convey similar understandings and intentions.

This evidence does not save plaintiffs from summary judgment.  Although the purpose of contract interpretation is to determine the intentions of the parties, only objective manifestations of intent are relevant under New York law.[40]  As the Court explained in *Faulkner II,* "statements of subjective intention uncommunicated to the other contracting party are immaterial in construing the terms of the contract."[41]  Here, plaintiffs do not identify any evidence that they conveyed their alleged understandings and intentions with respect to the "further use" language to NGS in the course of entering into the relevant contracts.  "Ucommunicated subjective intent alone

---

[38]

Allen Aff. ¶ 13.

[39]

*Ward,* 208 F.Supp.2d at 438.

[40]

*E.g., Klos v. Polskie Linie Lotnicze.* 133 F.3d 164, 168 (2d Cir. 1997) (objective intent of parties controls); *Rosoff v. Mountain Laurel Ctr. for the Perf. Arts,* 317 F.Supp. 2d 493, 499 (S.D.N.Y. 2004);  *Nycal,* 988 F.Supp. at 301 (citing *Hotchkiss v. Nat'l City Bank,* 200 F. 287, 293 (S.D.N.Y.1911), *aff'd,* 201 F. 664 (2d Cir.1912), *aff'd,* 231 U.S. 50 (1913)); *Wells v. Shearson Lehman.American Exp.,* 72 N.Y.2d 11, 24, 530 N.Y.S.2d 517, 524 (1988).

[41]

*Faulkner II,* 294 F.Supp.2d at 531, n.30; *Pan Am. World Airways, Inc. v. Aetna Cas. & Sur. Co.,* 505 F.2d 989, 1003 (2d Cir.1974); *see also, e.g., In re Robbins Int'l, Inc.,* 275 B.R. 456, 465 (S.D.N.Y.2002); *Bayer Corp. v. Chestnut Acquisition Corp.,* 189 F.Supp.2d 153, 157 (S.D.N.Y. 2002); *Nycal,,* 988 F.Supp. at 301-02.

14

cannot create an issue of fact where otherwise there is none."[42]

B.     *Evidence of NGS's Views of the CNG*

Next, plaintiff Ward points to evidence that NGS itself characterized the CNG as a novel  product distinct from the *Magazine*.  He invites the Court's attention to, among other things, NGS's marketing plan for the CNG, which characterized the product as "all-new," "unique," and "unprecedented."[43]  He points also to NGS's business plan for the CNG, which stated that "there appears to be no similar type of product, in size or scope,"[44] and to the copyright registration NGS filed for the CNG, which, he claims, described the CNG as "a new work . . . [that] had not existed before and was a 'compilation.'"[45]  Ward relies also on evidence that some NGS lawyers and executives personally believed the CNG was a new editorial and advertising use of plaintiffs' works and therefore required additional payments under the contracts.  In a 1997 memo, for example, NGS Illustrations Editor Dennis Dimick concluded that the CNG was  a further use of plaintiffs' work under the relevant contracts, asserting that

> "[t]he argument that [the CNG] is one and the same as the magazine is disingenuous.  The magazine is paper.  You had to COPY the magazine to create the CD-ROMs.  You have added a searchable index, which the magazine itself did not contain.  This

---

[42]

*Wells,* 72 N.Y.2d at 24, 530 N.Y.S.2d at 524.

[43]

Berger Decl. Ex. 26.

[44]

Berger Decl. Ex. 18.

[45]

*Ward* Supp. Mem. 7; Berger Decl. Ex. 24.

is a different product."[46]

Similary, Ward cites the deposition testimony of Robert Gilka, a former NGS executive who allegedly "authored the additional payment policies" in the contracts at issue.[47]  Mr. Gilka testified that the CNG was "a different format" from the *Magazine,* with a number of new features, including an electronic index and advertisements, and was "different enough to qualify for additional payment."[48]  Finally, he points to evidence that NGS in fact contemplated making additional payments to contributors for use of their works in the CNG.[49]

This evidence does not create a genuine issue of material fact.  Unlike plaintiffs' own statements, which convey their purported understandings and intentions at the time they entered into the relevant contracts, the statements by NGS agents and employees say nothing about NGS's views at the time the contracts were entered.  The statements, then, are nothing more than *post hoc* interpretations of the "further use" provisions by NGS employees who, with the exception of Mr. Gilka, are not even alleged to have participated in drafting or negotiating plaintiffs' contracts.

Such legal conclusions are inadmissible and may not be considered on a motion for

---

[46]

Berger Decl. Ex. 33.

[47]

*Ward* Supp. Mem. 9.

[48]

*Ward* Supp. Mem. 9-10 (quoting Gilka Dep.); *see also* Berger Decl. Exs. 30-32 (statements from other NGS lawyers and executives discussing the differences between the *Magazine* risks and the CNG and legal risks associated with the marketing the CNG).

[49]

Berger Ex. 35 (Memo from NGS employee Kent Knobersteen noting discussions at NGS of "securing separate rights of [stock photography] for the [CNG]").

16

summary judgment.[50]   Further, even if the statements were admissible, they constitute only "unilateral expression[s] of one party's postcontractual subjective understanding of the terms of the agreement and, therefore, . . . [are] not probative as an aid to the interpretation of the contract."[51] Nor is evidence that NGS contemplated paying contributors for use of their work in the CNG relevant in determining the meaning of the "further use" language.  Any large organization must assess its financial and legal obligations with great care, and this often involves considering a variety of alternatives.  The fact that NGS considered making additional payments does not prove that it was obligated to do so under the contracts or even that NGS believed it was so obligated.  Had NGS, in the last analysis, determined that the contracts required it to make additional payments to plaintiffs for use of their work in the CNG, it presumably would have paid them.

C.    *Course of Dealing*

Finally, both NGS and the plaintiffs rely on extrinsic evidence of the course of dealing between them.  Both cite evidence that NGS consistently paid plaintiffs when their contributions to

---

50

*Ward,* 208 F.Supp.2d at 439-440 & n.58; *see also Evans v. Port Auth.,* 192 F.Supp.2d 247, 262 & n. 16 (S.D.N.Y.2002) (citing cases).

51

*LaSalle Bank Nat. Ass'n v. Nomura Asset Capital Corp.,* 424 F.3d 195, 208 n.10 (2d Cir. 2005) (quoting *Murray Walter, Inc. v. Sarkisian Bros., Inc.,* 183 A.D.2d 140, 146, 589 N.Y.S.2d 613, 616 (3d Dept. 1992)); *see also Ingersoll Milling Mach. Co. v. M/V Bodena,* 619 F.Supp. 493, 506 (S.D.N.Y. 1985) (one party's subjective interpretation of contract, which was not communicated to the other party until litigation commenced, "cannot be used to establish that [parties] had such intent and understanding when they entered into the ... contract"); 22 N.Y. Jur. 2d, *Contracts* § 224 ("A unilateral expression of one party's postcontractual subjective understanding of an ambiguous agreement is not, however, probative as an aid to interpretation of the contract where there is no manifestation of mutual assent to such understanding, and such expression is not admissible as extrinsic evidence of the parties' mutual intent.")

the *Magazine* were reused in filmstrips, books, slide presentations, and promotional brochures. NGS points out, for example, that it "made additional payments to Ward when his contributions were published in multi-slide presentations, the Special Membership Test Booklet, and in the Magazine's cumulative index" and has paid "Psihoyos, Austen, and Rickman on numerous occasions for further editorial and advertising uses of their contributions, including when photographs taken by Austen were published in the CD-ROM product, 'Picture Atlas of the World,' and when Psihoyos' contributions were published in a multi-image slide show."[52] NGS appends extensive documentation of its payments to plaintiffs for such uses.[53] Plaintiffs also cite documentary evidence, including receipts and letters, demonstrating that NGS paid them for reuse of their work in its bound index,

---

[52]

    Def. Supp. Mem. 3-4.

[53]

    Def. Supp. App. Ex 37 (payment to Ward for use of two previously published *Magazine* photos in a multi-image slide presentation for promotional purposes), Ex. 38 (payment to Ward for use of three previously published *Magazine* photos in 1988 Symposium), Ex. 39 (payment to Ward for use of two previously published *Magazine* photos in Special Membership Promotion Test Booklet), Ex 40 (payment to Ward for use of four previously published *Magazine* photos in NGS's "illustrated cumulative index"), Ex. 41 (payment to Austen for use of eight previously published *Magazine* photos in CD-ROM "Picture Atlas of the World"), Ex. 42 (payment to Austen use of his photo in "Geographica section of National Geographic Magazine"), Ex. 43 (payment to Psihoyos for use of two previously published *Magazine* photos in "the Moscow 'Centennial multi-image show"), Ex. 44 (payment to Psihoyos for use of two previously published *Magazine* photos in the book *Crossing America: National Geographic's Guide to the Interstates*), Ex. 45 (payment to Psihoyos for use of one previously published *Magazine* photo "in a show entitled *Reflections on Water*, produced to increase awareness of freshwater conservation issues"), Ex. 46 (payment to Psihoyos for use of one previously published *Magazine* photo in NGS Annual Report), Ex. 47 (payment to Psihoyos for use of one previously published *Magazine* photo in MGM Module), Ex. 48 (payment to Psihoyos for use of one previously published *Magazine* photo in "a News Service Press Release about the Smell Survey"), Ex. 49 (payment to Rickman for use of one previously published *Magazine* photo in NGS's *Atlas of World History*), Ex. 50 (payment to Rickman for use of one photo in "NGS PictureShow: Looking at Ecosystems").

filmstrips, and books.[54]

NGS, however, contends that it does not pay contributors "when the use of their contributions is in the same context as in the Magazine."[55]  It provides evidence that it has produced and distributed microform and microfiche compilations of the *Magazine*, along with "bound volumes of the Magazine containing multiple issues . . . in a single volume,"[56] and asserts that it did not pay plaintiffs for use of their work in these formats and that plaintiffs never complained that they were entitled to additional payments.[57]  Aside from the vague and conclusory assertion that NGS "never

---

[54]

> *See, e.g.,* Berger Decl. Ex. 12 (letters and receipts showing payment to Ward for use of previously published *Magazine* photos in filmstrips, books, and lecture programs), Ex. 15 (letters to Ward requesting permission to reuse previously published photographs, in exchange for additional payment, in various educational filmstrips and showing payments for reuse of photos in filmstrips, books, and Special Membership Test Booklet), Ex. 16 (letters to Ward requesting permission for use of previously published *Magazine* photos an NGS children's book and showing payment for reuse of photos in other books, and "Educations services flier promoting 'The Living Earth Filmstrip,'" a "non-commercial broadcast, public service / public information video;" and an "educational product" entitled "NGS PicturePack: China"), Ex. 17 (payment to Ward for use of previously published *Magazine* photos in NGS's cumulative index); Allen Aff. Ex. P32 (payment to Allen for use of one previously published *Magazine* photo in NGS *Wonders of Learning CD-ROM Library*), Ex. P33 (payment to Allen for use of one previously published *Magazine* photo in *A Time Traveler's Guide to the Age of Dinosaurs*).

> Plaintiff Ward relies also on statements by NGS executives regarding NGS's policy of making additional payments for further use of contributors' works.  Ward Mem. 3-4.  It is unclear whether Ward cites these statements to bolster his claim for implied breach of contract or as extrinsic evidence of the meaning of the express agreements.  Either way, the statements outline the amounts to be paid for reuse of previously published magazine photos in filmstrips, books, promotional brochures, and the like, without any mention of additional payments for use of those works in microfilm, microfiche, or bound compilations of the *Magazine.*

[55]

> Def. Supp. Mem. 4.

[56]

> Sugarman Aff. Exs. C & E.

[57]

> Def. Supp. Mem. 4.

19

tried to make a product or use an image without payment for use of our works,"[58] plaintiffs do not dispute that they were not paid for use of their work in microform, microfiche, or bound compilations of the magazine. No do they provide any evidence to suggest that they requested payment for such uses from NGS.

Unlike the subjective intent or *post hoc* conclusions of contracting parties, the parties' course of dealing throughout the life of a contract is highly relevant to determining the meaning of the terms of the agreement.[59] As the Supreme Court has explained, "[g]enerally speaking, the practical interpretation of a contract by the parties to it for any considerable period of time before it comes to be the subject of controversy is deemed of great, if not controlling, influence."[60] Accordingly, the Court must assess the evidence regarding the parties' prior course of dealing in this case to determine whether any material issues of fact are in dispute.

Here, it undisputed that NGS (1) paid plaintiffs for use of their contributions filmstrips, books, slide presentations, and promotional materials, and (2) did not pay plaintiffs for use of their contributions in microform, microfiche, or bound compilations of the *Magazine*. It is clear, then, that NGS made additional payments when it reused plaintiffs contributions in a context different than the *Magazine* but not when it those works in a context identical to the *Magazine*. For

---

[58]

Allen Aff. ¶ 6.

[59]

*Hoyt v. Andreucci,* 433 F.3d 320, 332 (2d Cir. 2006); *Ocean Transport Line, Inc. v. Am. Philippine Fiber Indus., Inc.,* 743 F.2d 85, 91 (2d Cir. 1984) ("The parties' interpretation of the contract in practice, prior to litigation, is compelling evidence of the parties' intent.").

[60]

*Old Colony Trust Co. v. Omaha,* 230 U.S. 100, 118 (1913). *Accord, United States v. Stein*, Nos. S1 05 Crim. 0888, 06 Civ 5007 (LAK), 2006 WL 2556036, at *27 n. 141 (S.D.N.Y. Sept. 6, 2006).

20

example, NGS paid Mr. Ward for use of his work in its bound cumulative index.  As its name suggests, the index is a reference book listing the subjects of past *Magazine* articles – and the issues in which they appeared – in alphabetical order.[61]  Some of its pages feature photographs from one or more of the subjects listed on that page, which NGS "selected to represent the publications in which they appear."[62]  The photographs included in the index are not accompanied by the entire article with which they were first published or even presented in the same layout or size.  By contrast, the microform, microfiche, and bound compilations of the magazine, for which contributors did not receive additional payments, present the *Magazine* exactly as it originally appeared in print.  Plaintiffs contributions are displayed precisely as they were when first published in the *Magazine,* as part of the same articles, in the same order, and in the same layout.  It is undisputed that plaintiffs acquiesced in the distinction drawn by NGS without objection.

This undisputed evidence of the course of dealing between the parties under the contracts at issue compels the conclusion that the "further use" provisions require additional payments only if a new use presents the contributors' works in a context different than the *Magazine* article in which they originally appeared.  Here, the CNG presents plaintiffs' work in the same context as the *Magazine.*  As this Court made clear in *Faulkner II,* with a few immaterial exceptions, "[t]here are no changes to the content, format, or appearance of the issue of the *Magazine* reproduced in the CNG.  Each page of each issue appears to the user exactly as it was in the scanned print

---

[61]     Berger Decl. Ex. 17.

[62]     *Id.*; Sugarman Aff. Ex. 40.

version of the *Magazine,* including all text, images, advertising, and attributions."[63]  In fact, *Faulkner II* found the CNG "precisely comparable" to republication of periodicals on microform, a use for which NGS undisputedly made no additional payments under the "further use" provisions. Accordingly,  plaintiffs are not entitled to additional payments under their express contracts*.*

IV.     *Implied Contract Claims*

As noted above, in addition to claims based on their express contracts, plaintiffs bring claims for breach of implied contracts based on works they contributed without an express written contract or pursuant to an agreement that did not obligate NGS to make additional payment for further use of their contributions.  In the absence of an express contract, courts may infer an implied in fact contract from the conduct of the parties.[64]  Here, the parties' conduct is undisputed: NGS paid plaintiffs when it reused their contributions in contexts different than the Magazine, but did not pay for reuse in the same context, including use in microfilm, mirofiche, and bound compilations, without complaint from plaintiffs.  Accordingly, even assuming the Court could infer a contract requiring payment for further use of plaintiffs' works from the parties' conduct, the terms of that implied contract would not require payment based on the CNG.

---

63

*Faulkner II,* 294 F.Supp.2d at 540.

64

*Ward,* 208 F.Supp. 2d at 437-38.

*Conclusion*

For the foregoing reasons, the motion of defendant NGS for partial summary judgment dismissing the plaintiffs' claims for breach of express and implied contract is granted.


SO ORDERED.

Dated:        September 18, 2006

_____
Lewis A. Kaplan
United States District Judge

(The manuscript signature above is not an image of the signature on the original document in the Court file.)