UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
DOUGLAS FAULKNER, et al.,

        Plaintiffs,

        -against-                           97 Civ. 09361 (LAK)

NATIONAL GEOGRAPHIC SOCIETY, et al.,

        Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
LOUIS PSIHOYOS, et al.,

        Plaintiffs,

        -against-                           02 Civ. 6623 (LAK)

NATIONAL GEOGRAPHIC SOCIETY, et al.,

        Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


**MEMORANDUM OPINION**


Appearances:


        Bruce A. Lampert
        SCHADEN, KATZMAN, LAMPERT & McCLUNE
        *Attorneys for Plaintiff Louis Psihoyos*


        Robert G. Sugarman
        Denise Alvarez
        Jaime S. Kaplan
        WEIL GOTSHAL & MANGES LLP


        Terrence B. Adamson
        National Geographic Society
        *Attorneys for Defendants*

Lᴇᴡɪs A. Kᴀᴘʟᴀɴ, *District Judge.*

These actions were brought by free lance photographers whose worked appeared in the *National Geographic Magazine* against its publisher, the National Geographic Society ("NGS") and others, principally for copyright infringement and breach of contract. Their theory was that the reproduction of the work they had sold or licensed for use in the print edition of the magazine in a CD-ROM[1] version infringed their copyrights in the photographs or required additional payment as a matter of contract.

In a series of decisions, both this Court and the Court of Appeals have rejected these claims.[2] The principal holding was that the NGS, as holder of copyright in collective works (the print edition of the magazine) was privileged by Section 201(c) of the Copyright Act of 1976 (the "Act")[3] to reproduce the photographs in the CD-ROM edition because that edition was a "revision" of the print version within the meaning of the statute. What remains for trial is only the federal copyright infringement claim of plaintiff Psihoyos[4] with respect to the appearance of five photographs in the CD-ROM version, known as *The Complete National Geographic* (the "*CNG*").

---

[1] It appears that the product was sold also on DVDs. For ease of exposition, references in this opinion to CD-ROMs include DVDs.

[2] *E.g., Faulkner v. National Geographic Soc'y,* 409 F. Supp.2d 235 (S.D.N.Y.2004), *aff'd except as to a few photographs,* 409 F.3d 26 (2d Cir. 2005); *Faulkner v. National Geographic Soc'y,* 452 F. Supp.2d 369 (S.D.N.Y. 2006), *aff'd, sub* nom. Nos. 06-4863-CV (L), 06-5096-CV (CON), 06-5106-CV (CON), 06-5427-CV (CON), 06-5429-CV (CON) 2008 WL 2595181 (2nd Cir. Jun 27, 2008).

[3] 17 U.S.C. § 201(c).

[4] Counsel advises that the remaining claims of the other plaintiffs have been settled. The papers have not yet reached the Court.

Psihoyos claims that the agreements under which he granted the NGS the right to use the photographs in the magazine negated the presumption, established by Section 201(c), that the NGS was entitled to use them also in the *CNG.*

Defendants now move *in limine* to (1) limit the scope of plaintiff's potential damages to actual damages and to preclude him from seeking punitive damages and introducing evidence as to the issue of wilfulness, (2) to preclude plaintiff from offering evidence that (a) the *CNG* encourages users to "cut and paste" images from the CD-ROMs, and (b) one annual edition of the *CNG* contained an end user license agreement ("EULA"), inserted by a third party and later recalled by the NGS, that allegedly granted the user the right to use images extracted from the CD-ROM, and (3) to preclude much of the opinion of plaintiff's expert, Henri Dauman any evidence of damages using punitive multipliers.

## I.    *Punitive Damages and Evidence of Wilfulness*

Section 504 of the Act,[5] permits a copyright holder to recover "actual damages" or, in certain instances, statutory damages.[6]   The Second Circuit has made abundantly clear that "[p]unitive damages are not available in statutory copyright infringement actions."[7]   The Nimmers

---

[5]

17 U.S.C. § 504.

[6]

Plaintiff may not pursue statutory damages here because he did not register his claims to copyright in the photographs in question before the start of the alleged infringement.  *See, e.g., Mannion v. Coors Brewing Co.,* 530 F. Supp.2d 543, 554 (S.D.N.Y. 2008); 17 U.S.C. § 412.  His claim therefore is limited to "actual damages" under 17 U.S.C. § 504(a).

[7]

*Oboler v. Goldin,* 714 F.2d 211, 213 (2d Cir. 1983).  *Accord, On Davis v. The Gap, Inc.,* 246 F.3d 152, 172 (2d Cir. 2001).

have characterized the principal case upon which plaintiff relies for the contrary proposition as a "rogue decision [that] should not be followed."[8]  Accordingly, the plaintiff's punitive damages claim is stricken.

Plaintiff contends also that wilfulness nevertheless is at issue because it is an element of his infringement case.  He argues that:

> "Defendant asserts that this case is equivalent to an agreeable seller and an agreeable buyer negotiating at arms' length who simply could not reach mutually agreeable terms. This is an inaccurate, at the very least disputed, recitation of the facts. The evidence at trial will establish that Plaintiff does not sell his work in perpetuity, does not engage in so-called 'buy out' sales, and specifically refused to do so in this case. That fact was known to defendant. As a result, the Photographs at issue were expropriated, willfully infringed."[9]

But this misses the point.

Copyright infringement is a strict liability wrong in the sense that a plaintiff need not prove wrongful intent or culpability in order to prevail:

> "There are two basic elements to a copyright infringement action: (1) ownership of a valid copyright by plaintiff, and (2) copying by the defendant.  The second element is generally established by a showing that the defendant had access to the copyrighted work and that there is a substantial similarity of protectable material between the two works."[10]

Even an innocent copier – for example, one who copies in the belief that the infringed work is in the public domain or without realizing that he or she is copying – is liable although lack of culpability

---

[8]

4 *Nimmer on Copyright* § 14.02[C][2], at 14.31 (2008).

[9]

DI 187, at 4.

[10]

*Eastern America Trio Products, Inc. v. Tang Electronic Corp.*, 97 F. Supp.2d 395, 415 (S.D.N.Y. 2000).

may bear on statutory damages where those are in issue.[11]  The fact that the measure of actual damages here may well be a reasonable license fee, assuming a willing licensor and a willing licensee, is quite beside the point.  In consequence, there is no proper role for proof of wilfulness.  Its only function would be in service of an attempt by plaintiff to prejudice the jury's assessment of damages and, if it proves to be in issue, liability by portraying defendants in an unflattering light.

Accordingly, the evidence is not relevant because it would not make any fact at issue here more or less probable that it would be in its absence.[12]  And even if the evidence had some probative value on a question of consequence, its unfair prejudicial effect would outweigh it substantially.[13]

## II.    The EULA and "Cut and Paste" Capability

It appears to be common ground that Encore Software, which began manufacturing and distributing the *CNG* in 2001 but which now is in bankruptcy, inserted the EULA into the CD-ROMs for *CNG 112,* the edition for the last year in which the product was distributed.  The EULA would have licensed users of the CD-ROMs to extract and use images from the product.

---

[11]

*E.g.,* 4 *Nimmer on Copyright, supra* § 13.08.

The Nimmers point out that there was authority under the Copyright Act of 1909 to the effect that innocent intent was a defense to damages, albeit not to injunctive relief.  4 *Nimmer on Copyright* § 13.08.  The Second Circuit, however, rejected that view in *De Acosta v. Brown,* 146 F.2d 408, 410-11 (2d Cir. 1944), *cert. denied,* 325 U.S. 862 (1945).  In any case, defendants have not asserted a defense of innocent infringement, so the point is moot here, and this case is governed by the 1976 Act.

[12]

*See* FED. R. EVID. 401.

[13]

*See id.* 403.

NGS contends that the insertion of the EULA was a mistake and that it was done without NGS's authorization and consent. There appears to be no dispute that NGS, upon discovering what had occurred, halted distribution, ordered a recall of the product, and required Encore to send a notice to all identifiable end users who purchased the product containing the EULA. The notice informed recipients of the error, enclosed a corrected EULA, and offered a refund to customers who did not accept the terms of the corrected agreement.

So far as "cutting and pasting" is concerned, putting to one side the issue whether an end user who took advantage of any such capability would be licensed to do so, the Court understands NGS's position to be that there is nothing in the software that promotes, encourages or even facilitates "cutting and pasting" images and that the evidence in question is entirely irrelevant. According to NGS, in order to "cut and paste" an image from the CD-ROM, the user must (1) close the program and stop the *CNG* from running, (2) access the individual file stored on the particular CD-ROM containing the desired image, and (3) improperly manipulate the content of the CD-ROM using other software such as Adobe Photoshop. It is no different in concept, as both this Court and the Eleventh Circuit has held, from cutting, scanning or photographing an image from the print or microform editions of the magazine.[14]

Plaintiff does not dispute NGS's factual contentions with regard to the mechanics of "cutting and pasting." Rather, they conflate the EULA and the theoretical ability of an end user, licensed or not, to "cut and paste" an image from the CD-ROM to argue that evidence of both is relevant to damages. But this is misleading.

---

[14] *Faulkner v. National Geographic Soc'y,* 294 F. Supp.2d at 542 n. 91; *Greenberg v. National Geographic Soc'y,* 533 F.3d 1244, 1251 n.10 (11th Cir. 2008) (*en banc*).

As an initial matter, the circumstances in which the EULA found its way onto the CD-ROM for *CNG 112* have no proper bearing on this case. If, as NGS claims, it was a mistake by Encore that occurred without NGS's authorization or consent, it would be probative of nothing. And if, as plaintiff implies, NGS is responsible for it in some more direct way, it would go only to wilfulness or culpability, which for the reasons set forth above is not material here. So the evidence relating to the EULA is excluded under Rules 401 and 403.

Evidence with respect to "cutting and pasting" stands somewhat differently. The measure of damages here is likely to be what a reasonable license fee for use of plaintiff's photographs in the *CNG* would have been, assuming a willing licensor and a willing licensee. I can imagine, as a purely theoretical matter, that the size of the license fee for publication in the *CNG* might be higher *if* the availability on CD-ROMs of digital files containing plaintiff's images would permit an end user to "cut and paste" high quality copies of those images or, at least, higher quality copies than the end user might obtain by physically cutting and pasting, digitally scanning, or photographing the same images from the magazine. The likelihood that this is so, however, may be small for technical reasons.[15] Moreover, plaintiff has not identified any expert witness on this

---

[15] Digital images consist of pixels. Images for on-screen viewing typically have a maximum of 72 pixels per inch (PPI) and thus often require only comparatively small file sizes. Printing quality digital images of any size on paper typically requires substantially larger files affording higher resolution. Thus, simply copying a digital file used to generate an image intended for on-screen viewing may not permit the reproduction of an image acceptable for other uses. While there is software that permits production from small files of larger (or "ressed up") files, there are definite limits to the ability to produce files permitting acceptable quality enlargements from small files. *See generally, e.g.,* SUSAN M. BIELSTEIN, PERMISSIONS, A SURVIVAL GUIDE 127-31 (2006) (containing, among other things, images depicting the difference in quality between 72 ppi and 300 ppi reproductions of the same photograph); *Understanding Resolution* (available at www.luminous-landscape.com/tutorials/understanding-series/und_resolution.shtml (last visited Sept. 13, 2008); BARRY HYNES & WENDY CRUMPLER, PHOTOSHOP® 4 ARTISTRY 99-101 (1997).

subject, so the point may well be academic. For present purposes, however, it suffices to say that I cannot resolve this issue on the present record. Before making any argument or offering any evidence on the point, however, plaintiff shall make a detailed offer of proof outside the presence of the jury.

### III. Expert Testimony

### A. The Challenged Opinion

According to his report, Mr. Dauman, a free lance photographer, apparently intends to testify that a reasonable price for a license to use plaintiff's work in the CNG through August 2001 would have been approximately $181,250 per photograph.[16] He reaches this astonishing figure in the following manner:

1. He concludes, on the basis of various industry sources and unsubstantiated assertions, that the reasonable value of a base fee for the rights would have been $1,350 per image. While a number of the assumptions underlying this figure appear to be debatable, defendants dispute neither his qualifications to offer such an opinion nor the adequacy of the basis for it.

2. Mr. Dauman then notes that the base fee rests on what he says are widely used pricing grids that (a) suggest fees that generally increase with the

---

[16] I say apparently because the report in fact sets forth Mr. Dauman's opinion as to a reasonable license fee for 532 photographs of a different plaintiff, Fred Ward, whose claims have been dismissed. Defendants seek relief on the premise that Mr. Dauman would offer the same testimony as to the much smaller number of plaintiff Psihoyos' photographs at issue here. Plaintiff's response accepts this assumption. I therefore will decide the motion on that basis.

anticipated number of copies to be sold, and (b) reach a top category that varies from "more than 50,000," "over 80,000," to "100,000+." With the benefit of hindsight, he then points to the fact that the NGS sold over 1.2 million units of the CNG through August 2001. Arguing that "Mr. Ward [and presumably Mr. Psihoyos] deserved to share in the profits," he assumes that "NGS would have returned to Mr. Ward [and Mr. Psihoyos] three times more to obtain authorization to print 300,000, 600,000 and 150,000 units, respectively,"[17] and that these additional uses would have been licensed at 75 percent of the then current fee for each 150,000 units. This brings his figure from $1,350 to $7,551.54 per image for a total press run of 1.2 million units.[18]

3.  Next, Mr. Dauman doubles the fee to $15,103.08 on the theory that (a) the industry doubles or triples the normal fee where a copyright credit line is omitted or incorrect, and (b) the pages on which the disputed images appeared incorrectly bore NGS's copyright notice.

4.  He doubles the figure again – this time to $30,206.16 per image – on the theory that images could be downloaded, copied and printed from the CD-ROMs and that NGS encouraged users to do this. In his view, this foreclosed the photographer's ability to license exclusive rights to his photographs. But no support is given for the assumption that NGS's alleged action, even if Mr.

---

[17] This assumes, without any stated basis, that the license that would have been negotiated would have been limited to use in 150,000 units.

[18] The calculation appears at page 9 of Mr. Dauman's report. Alvarez Aff. Ex. A. It is discussed in greater detail below.

Dauman correctly describes it, actually would have had any impact on the ability to license the photographer's work. There is no basis given, for example, for Mr. Dauman's tacit supposition that the file sizes of the images in question that were on the CD-ROMs would have permitted generation of copies of the images of sufficient quality and size to have had any impact on the market for the photographers' work, even assuming that there would have been a market for these particular images.

5.    Finally, Mr. Dauman argues that the industry applies a multiplier of three to a reasonable base fee where an image mistakenly is used without authorization and that a fee of up to 10 times the base is used where the photographer has to go to court to "resolve the infringement."[19]  He settles, for no discernable objective reason, on a multiplier of six and thus opines that a reasonable fee of $181,236.96 per image would be appropriate here.

*B.    Discussion*

Defendants seek to exclude all of Mr. Dauman's testimony save the opinion that a reasonable fee would have been $1,350 per image – in other words, they challenge Steps 2 through 5 of Dauman's analysis.

*1.    Punitive Multipliers*

The basis for Mr. Dauman's six times multiplier is his personal view that "National

---

[19]    Nowhere does he explain how "the industry " applies a multiplier of up to 10 times where the photographer goes to court. All of such cases presumably are resolved by adjudication or settlement between the photographer and the alleged infringer.

Geographic basically stole the crown jewels from these photographers without paying anything." Indeed, he conceded at his deposition that "had they sought permission ahead of time the cost per picture was $1,350." In a similar vein, his application in Steps 3 and 4 of multipliers based on (1) the use of NGS's copyright notice on pages bearing plaintiff's images, (2) the alleged downloadability and printability of images from the CD-ROMs, and (3) NGS's alleged encouragement that end users, respectively, appear to rest, in part, on punitive considerations.[20]

As I have concluded above, the Copyright Act limits recovery in this case to "actual damages" and does not permit recovery of punitive damages. Whatever the industry may do or believe as a matter of voluntary and consensual practice does not trump Congress' limitation of damages for infringement in this case to actual damages.

It is conceivable that an error with respect to a copyright notice or attribution in a collective work like the CNG might result in damages to the owner of the copyright in the underlying photograph, although it is possible also that it would not. And at least one problem with Mr. Dauman's use of a multiplier based on alleged copyright or attribution issues in Step 3 is that there is no connection between the alleged wrong and any damage.[21] The use of such a multiplier is simply a vehicle for punishing the publisher.

The use of a multiplier in Step 4 – this one for alleged encouragement of users to

---

[20]     This is so as to Step 4 because he appears to base the use of the multiplier, at least to some extent, on the assumed fact that NGS encouraged such copying as distinct from its publication of a product that merely was susceptible of such misuse by end users.

[21]     Among the other problems are that (1) it appears that he is mistaken in believing that there was no credit line for the photographer in any of the instances at issue in this case, Alvarez Aff. Ex. C, and (2) NGS, as the owner of the copyright in the collective work, certainly was entitled to place its own copyright notice on it.

copy from the CD-ROMs – is similar to some extent. The application of the multiplier, in Mr. Dauman's opinion, appears to depend to some degree on whether the alleged infringer "encouraged" copying by end users – as distinguished from selling a product from which end users might copy without encouragement by the publisher. This evidences the partially punitive function of this multiplier.[22]

The application of a multiplier in Step 5 for the use of an image without authorization – in other words, for infringement – is purely punitive and entirely improper. It certainly is not anything that would have been agreed between a willing licensor and a willing licensee. Indeed, arguments substantially the same as Mr. Dauman's have been rejected in every case to consider the question.[23] In *Stehrenberger v. R. J. Reynolds Tobacco Holdings, Inc.,*[24] for example, Mr. Dauman submitted a report that, on this point, was substantially the same as his report in this case. But Judge Stanton ruled that such testimony was inadmissible because Mr. Dauman's opinion was based on "concepts of punishment for infringement, deterrence of similar behavior . . . , and recompense for the costs and effort of litigation" that "form no part of 'actual damages' under the statute."[25] In

---

[22]

      I deal below with the use of a multiplier based simply upon the alleged printability and downloadability of the images, divorced from any punitive concerns.

[23]

      A multiplier was used in circumstances such as this in *Bruce v. Weekly World News, Inc.,* 150 F. Supp.2d 313, 321 (D. Mass.2001), *vacated in part,* 310 F.3d 25 (1st Cir.2002). As Judge Stanton has pointed out, however, "[t]he *Bruce* court did not analyze the issue, because both sides' experts adopted the multiplier concept." *Stehrenberger v. R. J. Reynolds Tobacco Holdings, Inc.,* 335 F. Supp.2d 466, 468 (S.D.N.Y. 2004).

[24]

      *Id.* at 468-69.

[25]

      *Id. Accord, Straus v. DVC Worldwide, Inc.,* 484 F. Supp.2d 620 648-49 (S.D. Tex. 2007) (following *Stehrenberger*); *see also Fournier v. Erickson,* 253 F. Supp.2d 664, 665 (S.D.N.Y. 2003) ("no further argument on the matter of expert testimony on damages

consequence, even if Mr. Dauman had an acceptable basis for asserting that the industry applies such multipliers,[26] multiplier testimony would be inadmissible. Step 4, to the extent it rests on punitive considerations, and Steps 3 and 5 of his opinion are excluded.

### 2. *Additional Press Runs*

The measure of actual damages here is "the extent to which the market value of the copyrighted work at the time of the infringement has been injured or destroyed by the infringement."[27] In most circumstances, that will be the reasonable value of a license authorizing the defendant's use of the copyrighted work.[28]

Step 2 of Mr. Dauman's opinion presupposes that the value of a license for the CNG is determined by assuming that an initial license would have been limited to the sale of 150,000 units and that it would have been modified for successive increments as sales grew. His calculation may be understood from the following, which agrees with his figures (save for a rounding error in columns (3) and (4) of the fourth line) but presents them more clearly:

---

multipliers as industry custom will be considered").

[26] His basis for supposing that this is so is that the methodology, if it may be called that, is said to appear in the Business Practices Guide of the American Society of Media Photographers. Alvarez Aff. Ex. B, at 29. The fact that a group of photographers publishes a formula suggesting damage payments in cases of infringement that are overwhelmingly favorable to photographers, not to mention at odds with the Copyright Act, does not make that suggestion an industry standard.

[27] *Fitzgerald Publ'g Co. v. Baylor Publ'g Co.,* 807 F.2d 1110, 1118 (2d Cir. 1986).

[28] *On Davis,* 246 F.3d at 168.

| (1) Quantity | (2) Base Fee (75% of prior modification) | (3) Increased/ decrease for added/less quantity compared with preceding tranche | (4) Adjusted base fee (2+3) | (5) Addition for All languages | (6) Addition for multiple products | (7) Total (4+5+6) |
|---|---|---|---|---|---|---|
| 150,000 - 1st license | $450 | | $450 | $450 | $450 | $1,350 |
| 300,000 - 1st modification | $337.50 | $337.50 | $675 | $675 | $675 | $2,025 |
| 600,000 - 2d modification | $506.25 (75% of $675) | $506.25 | $1,012.50 | $1012.50 | $1,012.50 | $3,037.50 |
| 150,000 - 3d modification | $759.38 (75% of $1,012.50) | ($379.70)[29] | $379.68 | $379.68 | $379.68 | $1,139.04 |
| Total | | | | | | $7,551.54 |

But Mr. Dauman offers no basis for supposing that a reasonable license at the inception of this product would have been limited to 150,000 units, as opposed to some other quantity or not at all, save that he saw "some letters" in which the writer(s) said that they would be delighted if the *CNG* sold 100,000 to 150,000 copies.[30]  Nor does he offer anything to substantiate his assumptions that any initial unit-limited license would have been modified three times as opposed to once or that any subsequent modifications would have been based on increments of 150,000 units.[31]  Thus, even if

---

[29]    No explanation is offered for cutting the base fee by only half despite the fact that the additional quantity is only one fourth that for the prior increment.

[30]    *See* Alvarez Aff. Ex. B, at 57-61.

[31]    *See id.*

one were to accept his assumption that a later press run typically would be charged at 75 percent of the fee for the preceding increment to the total quantity, the aspect of his opinion that repeatedly compounds increases in the assumed base fee rests on nothing. Indeed, this entire portion of his opinion is constructed on a base of sand. It starts with an unsubstantiated assumption concerning an initial press run limitation and proceeds by nothing more than guesses about multiple renewals or modifications that, in reality, are excuses to increase his $1,350 base fee at a compound rate, each baseless step based on the preceding guess.

Expert testimony is admissible where it "will assist the trier of fact to understand the evidence or to determine a fact in issue" and is sufficiently reliable. In its determination of reliability under Rule 702, *Daubert v. Merrill Dow Pharmaceuticals,*[32] and its progeny, a district court must consider (1) whether the testimony is grounded in sufficient facts, (2) whether the underlying methodology is reliable, and (3) whether the witness has applied the method reliably to the facts.[33] In assessing reliability, a court should consider, perhaps among other factors, (1) whether the expert's theory "can be (and has been) tested;" (2) whether the theory "has been subjected to peer review and publication;" (3) the "known or potential rate of error;"(4) whether the theory has "widespread acceptance," (5) whether an expert's opinion was developed for litigation, and (6) whether the expert has accounted adequately for obvious alternative explanations.[34] The proponent of the testimony has the burden to show that it is relevant and reliable and must do so by a

---

[32]
    509 U.S. 579 (1983).

[33]
    *Zerumbet v. General Motors Corp.,* 360 F.3d 355, 358 (2d Cir.2004).

[34]
    *E.g., In re Rezulin Prods. Liab. Litig.,* 369 F. Supp.2d 398, 420 (S.D.N.Y. 2005) (internal quotation marks and citations omitted).

preponderance of the evidence.[35]

This aspect of Mr. Dauman's opinion is grounded only in assumptions, not in facts. The methodology is anything but reliable. It is not admissible.

### 3. Printability and Downloadability

As noted above, part of the alleged justification for the multiplier used in Step 4 is that the downloadability and printability from the CD-ROMs of the plaintiff's images impairs their value. But Mr. Dauman gives no reason to suppose that the size and quality of the images that could be produced in this fashion would have any effect whatsoever on the marketability of the photographer's work.[36] Even if one reasonably might suppose such an effect, there is no basis whatever for assuming any connection between the multiplier selected by Mr. Dauman and the economic damage to the photographer, thus running afoul of the limitation of recovery here to actual damages. Moreover, Mr. Dauman admitted in his deposition that his use of this multiplier was an

---

[35]  See Bargello v. United States, 483 U.S. 171, 175-76 (1987); Astra Aktiebolag v. Andrx Pharmaceuticals, Inc., 222 F. Supp.2d 423, 486 (S.D.N.Y.2002); Cayuga Indian Nation of New York v. Pataki, 83 F. Supp.2d 318, 322 (N.D.N.Y.2000).

[36]  Mr. Dauman grandly claims that "[t]he CDs have already led to worldwide infringement." Alvarez Aff. Ex. A, at 10. The only support for this assertion is his claim that a total of six photographs taken by plaintiff Psihoyos and one by former plaintiff Fred Ward have appeared on a total of three Internet web sites and that two photographs taken by Ward were used in advertising by a Canadian gem dealer. Id. Except in one instance, no evidence is offered to connect those uses to the CNG. And even if one were to assume that the CNG was the source of the images (as opposed to their having been obtained from legitimate sources or photographed or scanned from the magazine, not the CD-ROMs), there still would be little basis for concluding that the use of the images in the CNG would have a material or quantifiable effect on the market for plaintiff's images, particularly given the fact that the resolution and files sizes needed for satisfactory on-screen display appear to be so much smaller than those required for quality reproductions. Certainly Mr. Dauman does not even address this issue.

effort on his part to establish a new industry standard.[37]

### 4. Reasonableness

While the foregoing is more than sufficient to dispose of this point, I feel compelled to make one additional point. What plaintiff is entitled to here is actual damages, one measure of which is a reasonable license fee that would have been arrived at between a willing licensor and a willing licensee.[38] Plaintiff Psihoyos here claims infringement of copyright in five images. Were Mr. Dauman's theory of damages accepted, he would be entitled to damages of more than $900,000. And that is just a drop in the bucket. Mr. Dauman's theory, applied to plaintiff Ward, who claimed infringement with respect to 532 images and whose case has been dismissed on other grounds, would have yielded damages to Mr. Ward of more than $96 million.

Some sense of rationality must prevail in the law. Certainly if photographers doing this sort of work commanded such compensation in the real world, one would have expected Mr. Dauman to have said so. But there is nothing in this record to suggest that figures such as these are at all reasonable. As the burden of proving reasonableness is on the plaintiff, this affords an independent basis for rejecting Steps 2 through 5 of Mr. Dauman's opinion.

### IV. Conclusion

Accordingly, defendants' motions *in limine* with respect to punitive damages,

---

[37] Alvarez Aff. Ex. B, at 33-34.

[38] *On Davis,* 246 F.3d at 164-68.

evidence of wilfulness, and expert testimony (DI 172, DI 178, DI 180) are granted in all respects.

Their motion *in limine* with respect to evidence concerning the EULA and "cutting and pasting" (DI 182) is granted to the extent that (a) evidence concerning the EULA is precluded and (b) evidence and argument concerning "cutting and pasting" shall not be offered absent leave of the Court after a detailed offer of proof.

SO ORDERED.

Dated:          September 15, 2008

Lewis A. Kaplan
United States District Judge

(The manuscript signature above is not an image of the signature on the original document in the Court file.)